**JOHN D. COPANOS AND SONS, INC. and Kanasco, Ltd., Petitioners,**

v.

**FOOD AND DRUG ADMINISTRATION and Frank E. Young, M.D., Ph.D., Commissioner of Food and Drugs, Respondents.**

**No. 87–1464.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1988.

Decided Aug. 19, 1988.

512

James R. Phelps, with whom Robert A. Dormer, Washington, D.C., was on the brief, for petitioners. Judith R. Brunton, Washington, D.C., also entered an appearance for petitioners.

Gerald C. Kell, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., John R. Fleder, Director, Office of Consumer Litigation, Washington, D.C., Thomas Scarlett, Chief Counsel, Food and Drug Admin. and Eric M. Blumberg, Associate Chief Counsel, Food and Drug Admin., Rockville, Md., were on the brief, for respondents. Richard K. Willard, Asst. Atty. Gen *, Washington, D.C., also entered an appearance for respondents.

Before MIKVA, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

John D. Copanos & Sons, Inc., and Kanasco, Ltd., affiliated enterprises owned by John D. Copanos (hereinafter referred to collectively as Kanasco), manufacture and distribute human and veterinary drugs, including, until recently, a number of sterile injectable products. These injectable drugs were produced pursuant to a number of New Drug Applications (NDAs) and New Animal Drug Applications (NADAs) approved by the respondent Food and Drug Administration (FDA). On March 10, 1987, the FDA published a Notice of Opportunity for a Hearing (NOOH) in the Federal Register, proposing to withdraw Kanasco's NDAs and NADAs for sterile injectable products on the ground that the methods, facilities, and controls used to produce

* At time of appearance.

these drugs were inadequate to assure their identity, strength, quality, and purity. Kanasco responded to this Notice, and requested a hearing, but on August 6, 1987, the agency denied the hearing and summarily withdrew its approval of the company's applications, effectively barring Kanasco from producing the subject drugs.

Upon the company's petition for review, we conclude that Kanasco received adequate notice of the basis for the FDA's action, and that the agency did not err in proceeding by summary judgment to withdraw its approvals of Kanasco's applications. Accordingly, we deny the petition for review.

## I. STATUTORY BACKGROUND

The Federal Food Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (1982 & Supp. IV 1986) (FDCA), prohibits the introduction into interstate commerce of any new drug, or any new animal drug, unless an NDA or an NADA for that drug has been approved by the FDA. 21 U.S.C. § 355(a) (NDAs); *id.* at § 360b(a)(1)(A) (NADAs). Each application must include, among other things, reports of all investigations of the safety and efficacy of the drug, and "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug." 21 U.S.C. § 355(b)(1) (NDAs); *id.* at § 360b(b) (NADAs).

The Act also establishes procedures whereby the FDA, "after due notice and opportunity for hearing to the applicant," can withdraw its prior approval. 21 U.S.C. § 355(e) (NDAs); *id.* at § 360b(e) (NADAs). One of the statutory grounds for such withdrawal is that:

> the Secretary finds ... that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the methods used in, or the facilities and controls used for, the manufacture, processing and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity and were not made adequate within a reasonable time after receipt of written notice

from the Secretary specifying the matter complained of.

*Id.* at § 355(e) (NDAs); *id.* at § 360b(e)(2)(B) (NADAs). The standards for determining whether a manufacturer's "methods[,] ... facilities and controls" are adequate "to assure and preserve [the] identity, strength, quality and purity" of its drugs are set forth in the FDA's "Current Good Manufacturing Practice" (CGMP) regulations. *See* 21 C.F.R. Part 211. Those regulations govern numerous aspects of the manufacturing process, including (1) the qualifications and responsibilities of personnel; (2) standards for the design and construction of buildings, facilities, and equipment; (3) laboratory controls; and (4) requirements for record keeping, packaging and labeling. Drugs produced in violation of these CGMP regulations are deemed to be adulterated without the agency having to show that they are actually contaminated. 21 U.S.C. § 351(a)(2)(B); *see, e.g., United States v. Bel–Mar Laboratories, Inc.,* 284 F.Supp. 875, 880–81 (F.D.N.Y.1968).

FDA has rarely withdrawn its approval of an application for failure to comply with CGMP. Indeed, Kanasco maintains, without contradiction by the agency, that the only previous withdrawal actions based on this ground were uncontested and involved animal feed applications. *See Pembroke Elevator and Seed Co.,* 45 Fed.Reg. 79165 (1980); *Kahle Turkey Farms & Hatchery,* 43 Fed.Reg. 32866 (1978); *Standard Milling Co., Inc.,* 34 Fed.Reg. 6004 (1969); *see also* 21 U.S.C. § 360b(m)(3)(C). The order before us here, therefore, is the first contested withdrawal of approval of a NDA or a NADA on CGMP grounds. The circumstances leading up to the FDA's unprecedented action are briefly set forth below.

## II. FACTS

Both the NOOH and the final agency order withdrawing approval of Kanasco's NDAs and NADAs discuss in detail the unhappy regulatory history leading up to the present proceeding. We will therefore limit our narrative to those events that are essential to our decision. In particular, we

will confine our attention to events occurring in and after 1984. We pause here only to note that, in view of several earlier encounters with the FDA, Kanasco was no regulatory naif at the outset of this episode.

From late August through early October 1984, the FDA conducted a CGMP inspection of Kanasco's oral dosage form manufacturing facility. This inspection revealed numerous deficiencies in the company's manufacturing and quality control procedures, including inaccurate and even falsified manufacturing records, failure to calibrate laboratory equipment, unsanitary conditions in the manufacturing area, and production of a subpotent and impure animal drug. At the conclusion of the inspection, the FDA left with the company a Form FDA–483 listing the deficiencies noted in the inspection. *See* 21 U.S.C. § 374(b).

Based on the results of this inspection, the United States sought to enjoin Kanasco from the further manufacture and shipment of pharmaceuticals. *See* Complaint for injunction, *United States v. John D. Copanos & Sons, Inc.,* No. JH–84–3957 (D.Md.). The complaint and the accompanying exhibits described in detail the CGMP deficiencies revealed in the August–October inspection, noting, in particular, that "[t]here is not an adequate number of qualified personnel to perform and supervise the manufacture, processing, packing, labeling, and holding of each product." *Id.* at 12. Rather than contesting the allegations in this complaint, on November 2, 1984, Kanasco agreed that it would not manufacture or ship any drugs without the prior written authorization of the FDA, and the government dismissed the complaint without prejudice. In late November, Kanasco responded by letter to the observations in the Form FDA–483. This letter, for the most part, acknowledged the alleged deficiencies and promised corrective measures in the future. In January 1985, a consultant employed by Kanasco informed the FDA that the firm's injectable drug manufacturing operation was in compliance with CGMP.

In February and March 1985, the FDA returned to Kanasco to verify the consultant's assessment. Inspection of the facility once again revealed a variety of alleged deficiencies. The Form FDA–483 left with the firm noted the following problems, *inter alia:* failure to validate processing procedures, sterilization equipment, gowning procedures and the water injection system;[1] failure to have "primary barriers" in critical manufacturing areas; failure to assure proper air pressure, temperature and humidity in manufacturing areas; inadequate monitoring of the environment for microorganisms; incomplete cleaning procedures; and inadequate microbiological testing procedures. Kanasco again replied to the Form FDA–483 by letter, acknowledging the alleged deficiencies, disputing some of the agency's conclusions but promising improvements in the areas identified by the inspector. Kanasco also asked for approval to resume manufacturing (but not shipping) veterinary drugs, on the ground that it was then in compliance with CGMP.

Unsatisfied with this response, the FDA declined Kanasco's request to resume manufacturing, and criticized the "media fill" performed by Kanasco in February 1985. (A media fill is a test procedure in which product containers are filled with sterile growth media, run through the normal production procedures, incubated, and then examined for contamination; lack of contamination provides evidence that the filling process has been "validated.") The FDA also emphasized its concern with "the underlying cause of the deficiencies that were observed in [Kanasco's] laboratory," *viz.,* that the "firm does not have an adequate number of individuals with sufficient training and experience to perform the necessary quality control, quality assurance, and laboratory activities."

In May 1985, the FDA once again returned to Kanasco to evaluate the results

---

**1.** Validation is the process of demonstrating that an aseptic operation can consistently produce a sterile product.

of the company's recent media fills. The FDA judged these tests unsatisfactory and left a Form FDA–483 listing the following problems: lack of proper controls; no standard test procedure in place; failure of a control test used in conjunction with sterility testing to follow recognized compendial standards; failure to identify environmental contaminants found in the manufacturing area; and lack of follow-up investigations to determine the nature and causes of quality control test failures. In addition, according to the NOOH, the FDA sent a letter to Kanasco on May 10, renewing the suggestion that the "underlying cause" of the company's problems was the number, training, and supervision of personnel.[2] Kanasco once again responded with a letter promising improvements in the company's media fill process.

Then, in the summer of 1985, the FDA learned that, between January and June 1985, Kanasco had manufactured 23 lots—over one million vials—of injectable veterinary drugs, in violation of the 1984 Agreement. (FDA had authorized Kanasco to manufacture one batch of injectable product solely in order to test its manufacturing process.) Several thousand vials had been shipped to customers without FDA approval. In addition, the company withheld records that would have revealed the shipments.

In July 1985, FDA officials visited Kanasco to monitor the company's media fills. The Form FDA–483 prepared after this visit noted that flexible tubing had not been properly stored or sterilized, and that personnel in the aseptic fill room had touched exposed portions of their faces with gloved hands and reached across a conveyor holding previously sterilized bottles.

In the wake of these events, the government filed a second complaint for injunctive relief in the district court on August 7, 1985. On August 13, FDA returned to the company with a criminal search warrant. Based on this search, the FDA concluded that Kanasco had committed further violations of the CGMP record keeping requirements, including inconsistent records for the same lot of product; test results indicating product contamination that were not filed in the firm's batch records; and temperature recording charts that were not authentic. These additional allegations were brought to the attention of the court in supplemental affidavits filed by the government.

On September 5, the district court by consent entered an interim order prohibiting Kanasco from making or distributing injectable drugs without prior judicial authorization. The court later ordered Kanasco to show cause why a permanent injunction should not be entered against it. Instead, however, on November 4, Kanasco agreed to a "Consent Decree of Permanent Injunction." Like the 1984 Agreement, the 1985 Decree prohibited the company from distributing any injectable drugs manufactured at its plant until the facility was operated and administered in accordance with CGMP. The Decree also required Kanasco to obtain the FDA's written approval of any personnel with supervisory responsibility to the manufacture of drugs. On the same day, the FDA authorized Kanasco to resume manufacturing injectable drugs "based upon the certification of [Kanasco's consultant that its manufacturing plants] appear to be in compliance with [CGMP]" as required by the Consent Decree. Three weeks later, however, an FDA inspection to verify the consultant's representations once again revealed potential violations of CGMP, including: the continuing lack of a primary barrier over the sterile mixing tank; inadequately trained personnel; lack of a system to evaluate employees' training; inadequate microbiological test procedures, so that microorganisms found in the manufacturing area were not identified; and inaccurate record keeping. In addition, the FDA discovered that one subpotent product had been heated for 15 hours instead of one hour specified in the company's batch record. The company's response to these observations, in a letter dated December 6, 1985, disputed some of the agency's observations (*e.g.*, the need

2. This letter is not included in the Joint Appen-     dix on appeal.

for a primary barrier), but again promised improvements or changes in all the noted deficiencies.

On December 12, 1985, the FDA again sought a court order requiring Kanasco to cease the manufacture of all injectable drugs. Kanasco once again persuaded the agency, however, that the noted deficiencies had been, or would be corrected. The FDA, again without conducting an on-site inspection, authorized the company to resume manufacturing and shipping injectable drugs, and so notified the court.

Ten months passed without incident—or inspection. When the FDA reinspected Kanasco's manufacturing facility in September 1986, it noted numerous potential violations of CGMP, including, among others, the following: inadequate number and training of supervisory personnel; inadequately validated aseptic facilities and equipment; no primary barrier installed over the mixing tanks; unsanitary conditions in the aseptic manufacturing areas; inadequately trained employees; improperly maintained and uncalibrated laboratory equipment; failure adequately to monitor air quality and water for use in injectable drugs; and failure by laboratory personnel to follow recognized testing procedures and company operating procedures. Kanasco's written response to the FDA's Form FDA–483 disputed a number of the agency's conclusions, particularly the determination that facilities and equipment were unvalidated. Kanasco nonetheless promised a number of improvements.

The government again moved to enforce the 1985 Consent Decree. The court first temporarily enjoined Kanasco from manufacturing and shipping injectable drugs, and then by consent made the injunction permanent.

In December 1986 and January 1987, in an attempt to persuade the agency to allow its facility to reopen, Kanasco submitted to the FDA validation data relating to recent media fills. In February 1987, the FDA visited the Kanasco facility to collect data related to the recent submissions and to interview supervisory personnel. During its visits, the FDA encountered both new

and familiar problems including: failures to provide data demonstrating that its employees had received CGMP training and to propose any plan to ensure that they would receive such training on a continuing basis; failure to protect aseptic process equipment from dust and debris during renovation of the facility; methodological and record keeping problems with recent media fills; failure to install a primary barrier over the mixing tanks; failure properly to validate specific systems; failure to ensure that sterilized containers were maintained in a classified environment; use of inappropriate standard operating procedures for environmental monitoring; failure to establish specifications for air pressure differentials between various rooms of the clean area; and failure to make a commitment to cease the manufacture of nonpenicillin products for human use in the same facility where penicillin products are made.

Its patience finally exhausted, the FDA published a notice in the Federal Register on March 10, 1987, proposing to withdraw Kanasco's NDAs and NADAs for sterile injectable products. Seven of the NOOH's eight pages consisted of a "Regulatory History of Kanasco," recounting the above-stated chronology in greater detail. At the end of this recitation of deficiencies, which was organized around the various Forms FDA–483 left at the firm starting in 1976, the FDA concluded, in accordance with the terms of the statute that:

> on the basis of new information before [it], evaluated together with the evidence before [it] when the application was approved, the methods used in, and the facilities and controls for, the manufacture, processing, and packing of [sterile injectable] drugs are inadequate to assure and preserve their identity, strength, quality, and purity and were not made adequate within a reasonable time after receipt of written notice from the FDA specifying the matters complained of.

52 Fed.Reg. at 7318. The NOOH required Kanasco, if it wanted a hearing, to submit "the data, information, and analyses relied on to justify a hearing, as specified in 21

C.F.R. 312.200," and noted that the same regulation would govern any subsequent proceedings. The notice also warned that "[a] request for a hearing may not rest upon mere allegations or denials, but must present *specific facts* showing that there is a genuine and substantial issue of fact that requires a hearing." *Id.* (emphasis in original). Failing that, "the Commissioner of Food and Drugs will enter summary judgment against the person(s) who request the hearing, making findings and conclusions, and denying a hearing." *Id.*

Kanasco both requested a hearing and moved for summary judgment. The hearing request included a number of declarations and other exhibits that, according to the company, demonstrated that it was in compliance with CGMP and that it was committed to maintaining such compliance. The motion for summary judgment was based on the argument that the agency had not complied with the requirements in 21 U.S.C. §§ 355(e) and 360b(e)(2)(B) that it provide Kanasco with proper written notice "specifying the matter complained of" and "a reasonable time after receipt of written notice" within which to make adequate any deficiencies.

By a Notice published August 6, 1987, the FDA denied both the hearing request and the motion for summary judgment, and ordered that Kanasco's NDAs and NADAs be withdrawn from the market. *See* 52 Fed.Reg. 29274. The agency later denied Kanasco's Petition for Reconsideration, and its "Citizen's Petition for Revocation" of the August 6 order, which was based on a separate claim that new information showed its facility to be in compliance with CGMP.

Kanasco filed this petition for review, and the FDA then filed a motion for summary affirmance of its order, which we granted, in part. In particular, we rejected Kanasco's claim that the written notice required under 21 U.S.C. §§ 355(e) and 360b(e)(2)(B) may be issued only by the Commissioner of Food and Drugs, noting that FDA regulations delegated this authority to the Associate Commissioner for Regulatory Affairs. We also declined to

consider whether these statutes require the agency to send written notice of its intent to withdraw an NDA before issuing a NOOH, because the petitioners had failed to raise this objection before the agency.

Thus, the issues before us on this petition have been narrowed to the following: (1) whether the FDA's NOOH gave the petitioners sufficient notice to serve as the basis for administrative summary judgment; (2) whether the agency correctly determined that Kanasco's response to the NOOH failed to raise any genuine and material issue requiring an evidentiary hearing; and (3) whether the FDA erred in denying petitioners' request for reconsideration and their citizen's petition for revocation.

### III. NOTICE

Section 355(e) of 21 U.S.C., which governs the withdrawal of NDA approvals, requires the FDA to provide "due notice and opportunity for hearing to the applicant." *See also* 21 U.S.C. § 360b(e)(2) (NADAs). It is well settled that this provision does not guarantee the applicant a hearing in all circumstances; the agency may by regulation provide for summary withdrawal of approvals when there is no "genuine and substantial issue of fact that requires a hearing." *See* 21 C.F.R. § 314.200(g). *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973) ("[W]e cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that the application cannot succeed.").

The possibility of summary action makes the requirement of "due notice" especially important. As this court noted in *Hess & Clark, Inc. v. FDA:*

> When the FDA issues a Notice of Opportunity for Hearing, its summary judgment procedures are available if the requesting party fails to raise material issues of fact. For that reason, the contents of the response are of critical importance, and the need for and importance of the response in turn enhances

the significance of the notice given the adverse party. In order to be adequate, such notice given by the agency to an adverse party must contain enough information to provide the respondent a genuine opportunity to identify material issues of fact.

495 F.2d 975, 983 (D.C.Cir.1974).

Kanasco claims that it was denied such an opportunity because the agency failed to give it notice of the "type of information that is required to be submitted to justify a hearing." The company notes that while the FDA regulation governing hearing requests specifically advises companies of the information they must submit to justify a hearing on the issues of safety and efficacy, no comparable provisions address withdrawals based on CGMP violations. *See* 21 C.F.R. § 314.200(d)(1)–(2). According to Kanasco, this omission precluded it from making an effective response to the NOOH and thereby denied it the "due notice" to which it was entitled by statute.

Kanasco bases this notice claim on *Hynson, supra,* a case that considered the FDA's summary judgment proceedings in the context of the denial of a new drug application on the ground that the drug had not been shown to be "effective." Before 1962, NDAs were approved upon a showing that a drug was "safe." The 1962 amendments to the FDC Act directed the FDA to withdraw approval of an NDA if "there is a lack of substantial evidence" that the drug is also effective for its intended use. *See* Drug Amendments of 1962, Pub.L. No. 87–781, § 102(e), 76 Stat. 782 (codified as amended at 21 U.S.C. § 355(e) (Supp. IV 1986)). The amendments defined "substantial evidence" as "consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, ..." *Id.* at § 102(d) (codified as amended at 21 U.S.C. § 355(d) (Supp. IV 1986)).

As a result of these amendments, the FDA was required to reevaluate more than 4000 outstanding NDAs for substantial evidence that the covered drugs were "effec-tive." For help with this task, the FDA retained the National Academy of Sciences–National Research Council (NAS–NRC), which created expert panels to review the efficacy of all approved drugs. Holders of NDAs were invited to submit to the panels any data substantiating the efficacy of their drugs. If the FDA adopted the panel's conclusion that a particular drug had not been shown to be "effective," it would publish a notice indicating its intention to withdraw approval of the NDA, and offering the applicant the opportunity for a prior hearing. In order to avoid a large number of unnecessary proceedings, however, the FDA issued regulations establishing minimal standards for what it would accept as "adequate and well-controlled investigations" and limiting the right to a hearing to those applicants who could proffer at least some evidence meeting those standards. The agency's regulations provided that

> when it clearly appears from the data in the application and from the reasons and factual analysis in the request for the hearing that there is no genuine and substantial issue of fact which precludes ... the withdrawal of approval of the application, ... the Commissioner will enter an order on this data, making findings and conclusions on such data.

21 C.F.R. § 130.14(b) (1971).

In *Hynson,* the Supreme Court found that this administrative summary judgment procedure satisfied the Act's requirement of "due notice and opportunity for hearing" because the agency's regulations had reduced the statutory standard to "detailed guidelines," 412 U.S. at 617, 93 S.Ct. at 2477, giving "[t]he drug manufacturers ... full and precise notice of the evidence they must present to sustain their NDAs," *id.* at 622, 93 S.Ct. at 2479, while making it possible for the agency to discern "at the threshold" whether the applicant had tendered any evidence which on its face met the statutory standards. *Id.* at 620, 93 S.Ct. at 2478. In a footnote, which Kanasco emphasizes, the court noted that summary judgment might not be appropriate if the agency's regulations were not "precise" but called for "the exercise of discre-

tion or subjective judgment," such that it "may not be possible to tell from the face of a [submission] whether the standards have been met." *Id.* at 621 n. 17, 93 S.Ct. at 2479 n. 17.

We have not read *Hynson* to hold, however, that precise regulations specifying the type of evidence necessary to justify a hearing are a prerequisite to due notice whenever the agency is contemplating summary action. The requirements of "due notice" must depend upon the context of the agency's action. *See Cooper Laboratories, Inc. v. FDA,* 501 F.2d 772, 780 (D.C.Cir.1974). In *Hynson,* for example, the 1962 amendments to the Act placed on applicants the burden of producing "adequate and well-controlled investigations" demonstrating efficacy in order to retain their FDA approval. The success, *vel non,* of the applicant's submission therefore turned upon the types of evidence that would satisfy the statutory standard of "adequate and well-controlled." The agency's notice indicating its intent to withdraw approval, however, generally failed to explain why the information provided to the NAS–NRC panel did not meet this standard. *See, e.g., USV Pharmaceutical Corp. v. HEW,* 466 F.2d 455, 461 (D.C.Cir. 1972) (NAS–NRC reports upon which FDA notice relied were "cryptic and conclusory, without any statement of supporting facts"). Under those circumstances, particularized regulations were necessary to provide the applicant with notice of what its submission must contain in order to warrant continued authorization to market a drug. *See also American Cyanamid Co. v. FDA,* 606 F.2d 1307 (D.C.Cir.1979) (summary denial of NADA for failure to show safety, reversed); *SmithKline Corp. v. FDA,* 587 F.2d 1107 (D.C.Cir.1978) (summary denial of NDA for failure to show efficacy, remanded).

By contrast, the petitioners here were not confronted with any significant ambiguity regarding the type of information that would warrant a hearing before the agency. The NOOH discussed in detail the facts and evidence that formed the basis for the agency's proposed withdrawal of approval. Read in conjunction with the record of prior proceedings and the CGMP regulations, this document provided adequate notice of the type of information that Kanasco would have to submit in order to command a hearing. To take but one example, the NOOH alleged that Kanasco manufactured a drug product for human use that was required to be penicillin free in the same area and with the same equipment used to make products containing penicillin. *See* 52 Fed.Reg. at 7315; *see also* 21 C.F.R. § 211.42(d) ("Operations relating to the manufacture, processing, and packing of penicillin shall be performed in facilities separate from those used for other drug products for human use."). Due notice of the basis for the agency's action would hardly require the FDA to specify, in regulations or in the NOOH, what types of evidence Kanasco needed to submit to raise a material issue of fact about this allegation. The answer is self-evident: any competent evidence (e.g., affidavits or documentary exhibits) to the effect that (1) Kanasco did not in fact manufacture penicillin products using equipment also used for non-pencillin products; or (2) that the deficiency had been remedied within a reasonable time after receipt of written notice of the violation from the Secretary or his designee. We do not mean to suggest, of course, that an action withdrawing an NDA on CGMP grounds can never raise a genuine issue regarding the type of evidence that would be responsive. When the sorts of evidence that would be responsive appear to be obvious, however, as in this case, we think it is incumbent upon the petitioner to demonstrate how it was prejudiced by the lack of specific instructions telling it what to produce. Because Kanasco has failed to identify any evidence, or type of evidence, that it might have presented but for lack of notice as to its relevance, we reject the company's claim to any more specific notice than it received.[3]

---

**3.** Two further notice claims warrant brief mention. First, Kanasco complains that the NOOH did not identify, as to each violation alleged, the

applicable CGMP regulation. While such specificity would have been desirable, its absence is not material to Kanasco's "due notice" claim,

■ Nonetheless, we observe in the NOOH a more substantial notice problem that warrants discussion even though it does not feature prominently among petitioners' arguments. As we mentioned earlier, the NOOH consists largely of a highly detailed "Regulatory History of Kanasco" that proceeds in chronological order and is centered around the various Forms FDA–483 presented to Kanasco over the years. Both preceding and following this regulatory history are conclusory allegations that the facts stated in it satisfy the relevant statutory standard, i.e., that they demonstrate that the "methods used in, and the facilities and controls used for the manufacture, processing, and packaging of the sterile injectable drugs are inadequate to assure their identity, strength, quality, and purity, and were not made adequate within a reasonable time after receipt of written notice specifying the inadequacies." 52 Fed.Reg. at 7312; *see id.* at 7318. The NOOH failed, however, to organize the relevant facts in any way that would show *how* they met this statutory standard. Thus, both petitioners and this court were required to sift through an undifferentiated mass of "facts," and to rearrange them in a way that indicated whether the agency had made out its case. This manner of proceeding comes perilously close to obscuring the "basis" for the agency's action, and thus denying the applicant a meaningful opportunity to respond. We stop short of so holding because we are hesitant to reverse the agency on what is essentially a

matter of form, especially in view of the novelty of this proceeding. In future cases, however, the agency would be well advised to adopt a format for its notice that would clearly reveal (1) each CGMP violation that forms a basis for the withdrawal action, the specific regulation governing this violation, and the date or dates on which it was observed; (2) the date or dates on which the applicant received proper written notice of the violation; and (3) the date on which the violation was corrected or later observed to be still uncorrected. Such a format would make it easier for the petitioner to identify material issues in dispute and for the Court to ascertain if summary withdrawal of the approval was appropriate. While we do not intend to dictate any particular format for presenting this information, the agency may be assured that neither will we tolerate again its effectively shifting to this court its responsibility to organize in a sensible fashion the facts upon which it relies.

### IV. SUMMARY JUDGMENT

In response to the NOOH, Kanasco submitted a request for hearing supported by: (1) declarations from two employees and from two consultants; (2) copies of its previous written responses to the Forms FDA–483 that FDA inspectors had left at the firm between August 1984 and September 1986; (3) a copy of its December 22, 1986, letter to the FDA transmitting validation studies conducted by Kanasco in October 1986; and (4) a copy of its January

---

since most of the violations cited by the agency had previously been brought specifically to Kanasco's attention, with accompanying citations to the relevant regulation, in the various pleadings filed by the government in the district court action. In addition, we note that Kanasco has maintained throughout these proceedings that its consultant, who was an FDA employee for 28 years, was "intimately familiar with FDA's standards and expectations regarding good manufacturing processes." Therefore, there can be no claim that Kanasco lacked *actual* knowledge of the specific CGMP regulations at issue here.

Second, Kanasco suggests that it should have been afforded the opportunity to comment on a draft of the agency's order denying a hearing in accordance with 21 C.F.R. § 314.200(g)(3), which applies:

When following a general or specific notice of opportunity for a hearing a person requesting a hearing submits data or information of a type required by the statute and regulations, and the Director of the Center for Drugs and Biologics concludes that summary judgment against the person should be considered....

In response, the government contends that this procedure was not required because the agency issued a specific (rather than a general) notice, and the Commissioner (rather than the Director) determined that summary judgment was appropriate, pursuant to 21 C.F.R. § 314.200(g)(1). We need not resolve this dispute, however, because the petitioners failed to raise any argument based on § 314.200(g)(3) before the agency. *See* 21 U.S.C. § 355(h).

23, 1987, letter responding to a meeting which the firm had with FDA representatives in December 1986. Kanasco also incorporated by reference over 1000 pages of recent validation data.

Before proceeding to consider whether these materials precluded summary judgment, we pause to note the principles that govern the FDA's denial of a hearing and our review of that decision. The relevant statute allows withdrawal of Kanasco's approvals only if (1) "the methods[,] . . . facilities, and controls" used by the company are "inadequate to assure and preserve [the] identity, strength, quality, and purity" of the drugs, i.e., do not comply with CGMP; and (2) "were not made adequate within a reasonable time after receipt of written notice . . . specifying the matter complained of." 21 U.S.C. §§ 355(e), 360b(e)(2)(B). Under the FDA's regulations, summary judgment on these issues is appropriate only when "it conclusively appears from the face of the data, information, and factual analyses in the request for the hearing that there is no genuine and substantial issue of fact which precludes . . . the withdrawal of approval of the application." 21 C.F.R. § 314.200(g)(1).

As we have seen, this standard is more easily met when the agency has issued regulations that are "precise" and do not call for "the exercise of discretion or subjective judgment," *Hynson*, 412 U.S. at 621 n. 17, 93 S.Ct. at 2479 n. 17, but precise regulations are not necessarily a prerequisite to summary judgment. Indeed, we observed in *Cooper Laboratories*, 501 F.2d at 780, that even "a regulatory provision which seems vague in the abstract may nonetheless be conclusively at odds with a peculiarly deficient item of evidence." Thus, we have held that summary judgment may be entered not only for failure to comply with precise regulations, but also "on the basis of manifest noncompliance with general statutory or regulatory provisions, or even on the basis of obvious noncompliance with an undisputed particularization of general statutory mandates, so long as the regulated party is afforded ample opportunity to question or meet the newly-adopted standards." *American Cyanamid*, 606 F.2d at 1323.

The CGMP regulations on which the FDA based its withdrawal order in this case are "imprecise" in various places. *See, e.g.*, 21 C.F.R. § 211.67 (equipment and utensils to be cleaned, maintained, and sanitized at "appropriate intervals"); *id.* at § 211.25(a) (each employee to have the "education, training, and experience, or any combination thereof, to enable that person to perform the assigned functions"); *id.* at § 211.46(b) (requiring equipment to assure "adequate control over air pressure" when "appropriate"). Moreover, the agency's "particularization" of these general standards has been explicitly challenged by Kanasco in a number of instances where Kanasco's non-compliance with the regulation's requirements cannot fairly be described as "manifest." There are, therefore, several "issues of fact" that are genuinely in dispute.[4]

■ Nonetheless, as the Supreme Court recently noted in a case arising under the Federal Rules of Civil Procedure:

> [T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

4. For example, the FDA has repeatedly cited Kanasco for the failure to install a "primary barrier" over the mixing tanks. *See* 52 Fed.Reg. at 29283 (Feb.–March 1985 Inspection); *id.* at 29294 (Sept. 1986 Inspection); *id.* at 29300 (Feb. 1987 Inspection). The regulation upon which the agency relied, however, provides only that "[e]quipment for adequate control over air pressure, micro-organisms, dust, humidity, and temperature shall be provided when appropriate for the manufacture, processing, packing, or holding of a drug product." 21 C.F.R. § 211.46(b); *see* 52 Fed.Reg. at 29303. In responding to the September 1986 inspection, Ka-

nasco argued that a primary barrier would be "purely cosmetic . . . or liable to make the situation worse, not better," *see* Exhibit 7 to Kanasco's Request for Hearing at 6, and Kanasco's consultant suggested that no barrier was necessary because "the environmental data for the room and sterile tests of products produced over many years indicated that the environment in [the] room was satisfactory." Exhibit 2 to Kanasco's Request for Hearing at 2. Kanasco's challenge (supported by expert testimony) to the agency's attempt to "particularize" § 211.46(b) thus makes summary judgment on the primary barrier question inappropriate.

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986) (emphasis in original). These principles apply with equal force in the context of administrative judgment. *See Veg–Mix, Inc. v. Department of Agriculture*, 832 F.2d 601, 607–08 (D.C.Cir.1987). Thus, in order to warrant a hearing, it is not sufficient that Kanasco's submission raised questions of fact regarding some of the CGMP violations described in the agency's NOOH. Instead, that submission must raise a genuine issue about whether Kanasco is (1) in compliance with CGMP; and (2) corrected deficiencies within a "reasonable" time of their being brought to its attention.

■ Kanasco's request for a hearing failed to make this showing. Turning to the second issue first, the record documents numerous instances where obvious or undisputed violations of CGMP were allowed to persist long after Kanasco had received appropriate notice from the FDA.[5] Although the record contains what appear to be many such examples, we have traced only a few through the FDA's "Regulatory History" of Kanasco; more are not necessary to the FDA's case.

First, during the August–October 1984 Inspection, the FDA inspector observed that Kanasco's laboratory equipment had not been regularly and routinely calibrated or standardized. *See* 52 Fed.Reg. at 29280; 21 C.F.R. § 211.160(b)(4) (requiring the calibration of laboratory equipment "at suitable intervals in accordance with an established written program"); *see also id.* at § 211.68 (requiring calibration of equipment). Kanasco received written notice of the problem in the FDA's October 1984 Complaint for Injunction. In its November 30, 1984, letter to the FDA, Kanasco offered an explanation for its failure to calibrate some pieces of equipment, but not others; did not offer any explanation for its failure to maintain calibration records; and promised improvements. *See* Exhibit 15 to Kanasco's Request for Hearing at 13–14. The same problem was observed again during the September 1986 Inspection, *see* 52 Fed.Reg. at 29294–95. In its October 10, 1986, letter, Kanasco responded to some of the FDA's allegations regarding calibration, but conceded others. *See* Exhibit 7 to Kanasco's Request for Hearing at 17, 18–19, 21, 24, 31–32, 35. This response also revealed that Kanasco failed to maintain complete calibration records. *See id.* at 24, 31–32, 35.

Second, during the period from October 1984 to January 1987, the FDA repeatedly notified Kanasco that its employees were inadequately trained and supervised. Although the relevant regulation, quoted above, is "imprecise," the violations that formed the basis for the FDA's conclusion were either not contested or were "manifest." In October 1984, the FDA alleged that Kanasco's employees did not have ade-

---

5. Kanasco is correct that both the NOOH and the withdrawal order were insufficiently focused on violations that were not corrected within a reasonable period of time. Had the agency, like the statute, limited its concern to continuing or recurring problems, rather than reciting virtually every violation observed during and after 1984, these proceedings might have been greatly simplified.

The agency's failure to adopt this streamlined approach suggests that there is an unspoken argument driving it in these proceedings, to wit, that despite the suggestion in 21 U.S.C. § 355(a) that only "uncorrected" CGMP violations may

form the predicate for withdrawal of approval, the FDA is authorized to withdraw approval when consecutive inspections reveal numerous, and flagrant CGMP violations, regardless of whether these violations are remedied within a reasonable time after they are noted. In other words, the argument is that the FDA is entitled to withdraw its approval when the applicant's conduct demonstrates that the agency can have no confidence in its willingness and its ability to comply with CGMP. While this phantom argument is not without force, we postpone considering it until a day when it appears before us in the flesh.

quate training and experience, basing this allegation on (a) "the falsification of production records"; and (b) "the nature and extent of the record-keeping discrepancies" it found. Complaint for Injunction at 12; *see* Declaration of Salvatore J. Turco at para. 3–4. In its November 30, 1984 letter to the FDA, Kanasco conceded most of the numerous record keeping violations observed by FDA, blaming them on a variety of causes including the "inexperience of the [company's] consultant with the Company numbering and paperwork systems." Exhibit 15 to Kanasco's Request for Hearing at 4. The company promised extensive improvements with respect to its personnel. *See id.* at 6, 11. Nonetheless, problems indicating the lack of proper training persisted. During the July 1985 inspection, for example, the FDA observed employees in the aseptic filling room touching exposed portions of their faces with their hands. *See* 52 Fed.Reg. at 29287. Kanasco did not respond to this observation. During the November 25–26, 1985 inspection, an employee was observed sampling sterile powder without sanitizing his hands; the FDA also noted that the firm had no system to evaluate the aseptic training of its employees. *See* 52 Fed.Reg. at 29290. In its December 6, 1985 response, Kanasco argued that "the one operator referred to in this observation should not be the basis for concluding that our training is inadequate." Exhibit 10 to Kanasco's Request for Hearing at 1. Kanasco also alleged that "[a]ll employees have received CGMP training," promised additional training in the future and pledged to evaluate the effectiveness of this training on a "systematic and continuing basis." *Id.; but see* Declaration of Kenneth E. Avis at 10–12 (June 19, 1986) (Kanasco's production supervisor and CGMP consultant "advised FDA investigators that employees ... had received only

marginal training in aseptic manufacturing procedures.") In September 1986, FDA observed improperly gowned employees entering and exiting clean areas of the aseptic fill facility "after touching walls, floors, and trash bags in non-clean areas, mopping up stagnant floor drain water with rags and then, with the same rags, cleaning equipment used to fill sterile products and filters used to purify air at the aseptic filling line...." 52 Fed.Reg. at 29294.[6]

Third, during the May 1985 inspection, FDA discovered that Kanasco had not conducted follow-up investigations to determine the nature or cause of quality control test failures. *See* 52 Fed.Reg. at 29285; 21 C.F.R. § 211.192 (requiring "any unexplained discrepancy" in production and control records to be "thoroughly investigated," and a "written report of the investigation" to be prepared). Kanasco did not deny this allegation. *See* Exhibit 12 to Kanasco's Request for Hearing at 2. As a result of the search warrant executed at Kanasco on August 13, 1985, the FDA once again discovered that Kanasco had failed to investigate and report on test results indicating contamination. *See* 52 Fed.Reg. at 29288; Kanasco was formally advised of this deficiency during the 1985 proceedings in the district court. *See* Fourth Declaration of Carl I. Turner at 7–8 (Oct. 22, 1985). Nonetheless, the same type of failure was observed during the November 1985 inspection, *see* 52 Fed.Reg. at 29290, and was not denied by Kanasco in its response to the agency's Form FDA–483. *See* Exhibit 10 to Kanasco's Request for Hearing at 3.[7]

As these examples demonstrate, Kanasco's generic claim that "[w]hen FDA's observations presented possible CGMP deficiencies, Kanasco responded quickly and completely" is at odds with the uncontradicted specific facts in the record in this case. Indeed, that record reveals numer-

---

**6.** Kanasco's October 1986 response noted that the employees involved in this incident were not the normal clean room clean-up crew and that the supervisor involved had been "reprimanded." Kanasco also promised to "perform additional GMP trainging [sic] on proper clean-up procedures and proper gowning techniques." Exhibit 7 to Kanasco's Request for Hearing at 13.

**7.** Kanasco's response indicated that an investigation into this problem occurred "[a]t the time of inspection," i.e., after the problem was noted by the FDA. *See* Exhibit 10 to Kanasco's Request for Hearing at 3.

ous instances in which CGMP violations were not corrected within a reasonable period of time.

Kanasco advances an alternative claim, namely, that the FDA is precluded by the terms of the 1985 Consent Decree from relying on any deficiencies observed before the end of 1985. This argument proceeds as follows: the language of the Consent Decree prohibited Kanasco from manufacturing any drugs until the FDA determined that Kanasco was in compliance with CGMP. On the same day the Consent Decree was signed, however, the FDA notified Kanasco that its plant appeared to be in compliance with the terms of the Decree. *See* Letter to John D. Copanos from FDA's Baltimore District Director dated November 4, 1985. Kanasco thereafter resumed the manufacture of veterinary drugs. Thus, according to Kanasco, "the only alleged CGMP deficiencies that could possibly be at issue in this proceeding are the deficiencies that were brought to Kanasco's attention after January of 1986."

■ This argument is doubly flawed. First, even if the decree and the FDA's simultaneous letter acted as a "certification" of Kanasco's then compliance with CGMP, there is no basis for the implicit suggestion that a deficiency that had been observed before, and that recurred after, the consent decree cannot constitute a failure to comply with CGMP that was not "made adequate within a reasonable time after receipt of written notice." *See* 21 U.S.C. § 355(e). This interpretation of the statute would allow manufacturers that chronically violate CGMP to avoid the withdrawal of their approvals by momentarily "correcting" the deficiencies each time they are noted by the FDA. Second, the FDA did not "certify" or even conclude that Kanasco was in compliance with CGMP; it simply, as it made express in the letter, accepted the representation of Kanasco's expert to that effect. Therefore, regardless of whether the FDA's actions were in accord with the terms of the consent decree (or with the FDA's responsibilities to the public), there can be no argument that the consent decree wiped Kanasco's slate clean,

as a matter either of law or of fact. Thus, we conclude that from August 1984 to October 1986, when it ceased all production of injectable drugs, Kanasco's "methods[,] . . . facilities and controls" were "inadequate" and were not "made adequate within a reasonable time after receipt of written notice, specifying the matter complained of."

■ Kanasco also maintains, however, that its submission created a material issue of fact regarding whether it was in compliance with CGMP at the time the agency moved to withdraw its approvals. After reviewing the record, we once again conclude that while its submission does raise genuine issues of fact, those issues are not material to the resolution of this case.

As a preliminary matter, we question whether the statute requires the FDA to demonstrate that Kanasco was not in compliance with CGMP "when FDA issued its NOOH." True, the language of the Act can be read to suggest that current noncompliance is always a prerequisite to withdrawal of approval on CGMP grounds, *see* 21 U.S.C. § 355(e) (methods, facilities and controls *"are* inadequate") (emphasis added). On the other hand, requiring current non-compliance would substantially diminish FDA's ability to move against manufacturers who repeatedly violate CGMP but pull themselves temporarily into compliance each time the FDA begins the process of withdrawing their approvals. We need not decide the question, however, because Kanasco failed to contest a number of "current" deficiencies noted by the FDA in its NOOH, and thus, has not shown that it brought itself, even temporarily, into compliance with CGMP.

The FDA relied on a number of CGMP deficiencies that it observed at the Kanasco facility about one week before it published the NOOH, including *inter alia:* (1) failures to provide data demonstrating that its employees had received CGMP training and to propose any plan to ensure that they would receive such training on a continuing basis; (2) failure to protect aseptic processing equipment from dust and debris during renovation of the facility; (3) failure to

install a primary barrier over the mixing tanks; (4) failure to ensure that sterilized containers were maintained in a classified environment; (5) use of inappropriate standard operating procedures for environmental monitoring; (6) failure to establish specifications for air pressure differentials between various rooms of the clean area; and (7) failure to make a commitment to cease the manufacture of non-penicillin products for human use in the same facility where penicillin products are made. In addition, the FDA alleged that several of Kanasco's systems were not properly validated, and that the tests completed by Kanasco, including its media fills, were inadequate or inaccurate. Finally, the FDA asserted, based in part on interviews in February 1987 that Kanasco's candidates for Director of Quality Assurance and for Director of Quality Control, did not have sufficient background, training, and experience to perform their jobs properly. *See* 52 Fed.Reg. at 7316–17.

To demonstrate that it raised material issues of fact regarding these allegations, Kanasco points first to more than 1,000 pages of data documenting the numerous media fills it performed in October 1986. According to Kanasco, these data, which were incorporated by reference in its Request for Hearing, show that its manufacturing systems were properly validated. We note, however, that the agency's NOOH listed numerous methodological deficiencies in these validation data, including failure to mimic worst case, or even normal, production conditions, unexplained discrepancies regarding the order in which various procedures were alleged to have been performed, and missing raw data. The FDA further alleged that Kanasco had failed to validate a number of individual subsystems. Kanasco failed to respond to

these specific allegations in its Request for Hearing. Instead, Kanasco offered only the general and unsupported statements of its experts to the effect that Kanasco's systems had in fact been validated. *See* Kanasco's Request for Hearing, Exh. 1 at 3–4; Exh. 2 at 3. Because these statements fail to address the specific problems identified by the FDA, they do not create a genuine issue of fact.

Moreover, even if Kanasco's submission did create an issue of fact on the validation question, it would not be material since the company failed entirely to respond to a number of other allegations in the NOOH, including the failure to protect equipment during renovation of its plant, and the failure to store sterile containers in an appropriately classified environment.[8] In view of these uncontested violations, there is no need for us to consider whether the declarations of Kanasco's two candidates for supervisory positions precluded the FDA from concluding, without a hearing, that they were unqualified.

█ In sum, the record demonstrates that in several respects Kanasco's methods, facilities and controls were "inadequate and were not made adequate within a reasonable time after receipt of written notice specifying the matter complained of." 52 Fed.Reg. at 29307.[9] The FDA was therefore entitled to withdraw Kanasco's NDAs and NADAs for injectable drugs without holding a hearing.

## V. THE SUBSEQUENT PETITIONS

Kanasco also seeks review of the FDA's denial of its Petition for Reconsideration, and of its Citizen Petition for Revocation, both filed September 1, 1987. The Petition for Reconsideration (1) elaborated upon the notice arguments made in Kanasco's mo-

---

8. Kanasco did attempt to respond to these concerns, and to the FDA's criticisms of its media fill data, in Exhibit A to its Petition for Reconsideration. This belated attempt to supplement the record is discussed in Part V of this opinion.

9. We find no need to determine whether the uncontested violations observed in February 1987 were the same as, or different from, earlier deficiencies that had not been corrected by the

company within a reasonable period of time. While the statute might be read to preclude the FDA from relying on current violations that differ from previous violations, Kanasco has not argued here that it was entitled to prevail as long as its particular violations of CGMP at the time of the withdrawal proceedings were novel; it maintains only that it was "in compliance with CGMPs when FDA issued its NOOH."

tion for summary judgment; (2) took issue with the FDA's characterizations of Kanasco's replies to the Forms FDA–483; (3) responded "for the first time" to allegations in the NOOH regarding conditions at Kanasco during February 1987; and (4) argued that the FDA had erred in failing to consider Kanasco's recent corrective measures. The "Citizens Petition" submitted new evidence that Kanasco's facility was in compliance with CGMP requirements, including new validation data, verified statements regarding the import of that data, and evidence concerning Kanasco's CGMP training program. The Commissioner of Food and Drugs denied both petitions in a letter dated September 3, 1987.

■ We find that neither petition is appropriately before us for review. With respect to the Petition for Reconsideration, we note, as did the agency, that under FDA regulations, such a petition "may not be based on views or information not contained in the administrative record on which the decision was made." 21 C.F.R. § 10.33(e). To the extent that Kanasco's petition contained new information or arguments, therefore, it was properly denied by the agency. To the extent that Kanasco's petition elaborated upon arguments already in the record, however, the agency's decision, which "merely denie[d]" that petition, is not subject to judicial review. *See ICC v. Brotherhood of Locomotive Engineers,* —— U.S. ——, 107 S.Ct. 2360, 2366, 96 L.Ed.2d 222 (1987) ("[W]here a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.,* on the same record that was before the agency when it rendered its original decision, 'an order which merely denies rehearing of . . . [the prior] order is not itself reviewable.' ")

(quoting *Microwave Communications, Inc. v. FCC,* 515 F.2d 385, 387 n. 7 (D.C.Cir. 1974)).

■ As for the Citizen's Petition for Revocation, the government contends that Kanasco has not effectively sought review of its denial. Under Rule 15(a) of the Federal Rules of Appellate Procedure, a petition for review of an administrative agency order must "designate . . . the order or part thereof to be reviewed." Kanasco's petition for review in this court asked for relief only from the Commission's August 6, 1987, withdrawal order. Kanasco suggests that review of its subsequent petitions is nonetheless appropriate because the petitions and the FDA's letter denying them have the same docket number as the FDA's withdrawal order and are part of the administrative record before this court. In view of the plain language of Rule 15(a), however, we cannot agree that a petition for review designating one order in a proceeding suffices to obtain review of any other order that is part of the same administrative record. Thus, we conclude that the denial of Kanasco's Citizen's Petition is not before us for review.

## VI. CONCLUSION

For the reasons stated above, the petition for review is

*Denied.*